**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PHILLIP BUCHANAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:22-cv-01361-JAR |
| | ) | |
| CHS TX, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants Perigrove 1018, LLC, Isaac Lefkowitz, M2 HoldCo, LLC, and M2 LoanCo, LLC's Motion to Dismiss (ECF No. 60); Defendants Perigrove, LLC and Geneva Consulting, LLC's Motion to Dismiss (ECF No. 63); and Defendant Angela Adams's Motion to Dismiss (ECF No. 81). For the reasons set forth below, the motions will be denied.

### I. Background

On December 26, 2020, Plaintiff suffered a stroke while incarcerated at the Eastern Reception, Diagnostic and Correction Center in Bonne Terre, Missouri. ECF No. 34 ¶¶ 1, 3. Plaintiff presented to the medical unit with unclear speech, sluggish eye tracking, an unsteady gait, and stuttering, which Nurse Bryon Farmer believed were signs of intoxication. *Id.* ¶¶ 25, 29. As a result, Plaintiff did not receive medical treatment but was instead placed in administrative segregation. *Id.* ¶ 30. On December 29, 2020, a nurse informed Nurse Practitioner Angela Adams that Plaintiff's symptoms persisted and that "he was unable to state when he was born or where he lived." *Id.* ¶ 33. The following day, Plaintiff was transferred to the prison's Trauma Care Unit, where he exhibited difficulty speaking and swallowing, pain in his right leg and arm,

and the inability to grip things, among other symptoms. *Id.* ¶ 35. On December 31, 2020, Plaintiff was transferred to Mercy Hospital in Jefferson County, where he was hospitalized until January 8, 2021. *Id.* ¶¶ 37, 39.

When Plaintiff's medical incident occurred, the Missouri Department of Corrections was contracting with Corizon, LLC ("Corizon") to provide medical services to inmates held in the Missouri Department of Corrections. *Id.* ¶ 6. Corizon, a Missouri limited liability company, was a wholly owned subsidiary of Corizon Health, Inc., a Delaware corporation, until the two merged with other Corizon entities into a single Texas corporation called Corizon Health, Inc. in May 2022. *Id.* ¶¶ 6–7. Immediately thereafter, Corizon Health, Inc. underwent a divisional merger, subdividing into two Texas corporations: Corizon Health, Inc., later renamed Tehum Care Services, Inc. ("Tehum"), and CHS TX, Inc. *Id.* ¶ 8. Tehum, which was assigned Corizon's tort liabilities, filed for bankruptcy shortly thereafter. *Id.* ¶¶ 11, 47.

According to Plaintiff, Perigrove 1018, LLC, a New York limited liability company ("Perigrove 1018"), was Corizon's beneficial owner and parent. *Id.* ¶ 12. Isaac Lefkowitz, a citizen of New York, allegedly served as member and controller of Perigrove 1018 and its alter ego, Perigrove, LLC ("Perigrove"). *Id.* ¶¶ 12–14. Plaintiff submits that Perigrove 1018 and Lefkowitz orchestrated the Corizon reorganization and divisional merger described above to "strip Corizon of its valuable assets, employees, and going-concern value while leaving its tort liabilities, including claims like [Plaintiff's], in a shell entity with no resources to satisfy them." *Id.* ¶ 40.

Plaintiff further alleges that in order to financially deplete Corizon, the company transferred $24,538,155.19 to M2 LoanCo, LLC ("M2 LoanCo") between December 2021 and November 2022. *Id.* ¶ 48. Lefkowitz controlled M2 LoanCo and its parent company, M2

HoldCo, LLC ("M2 HoldCo"), both of which are based in Florida. *Id.* ¶¶ 15–16. Between December 2021 and May 2022, Corizon also transferred $5,500,000 to Geneva Consulting, LLC ("Geneva").[1] *Id.* ¶ 49. Neither Geneva nor M2 LoanCo provided any legitimate services of value to Corizon in exchange for the transfers. *Id.* ¶¶ 48–49.

In early 2025, Tehum and several affiliates reached a Joint Chapter 11 Plan of Reorganization. *See In re Tehum Care Servs., Inc.*, 672 B.R. 108, 110 (Bankr. S.D. Tx. 2025). Under the Plan, the "Settlement Parties"—YesCare Corp. and its wholly owned subsidiaries, Geneva, Perigrove 1018, Perigrove, M2 HoldCo, M2 LoanCo, and PharmaCorr LLC—collectively agreed to pay $50 million in installments to two trusts in exchange for the release of certain claims. ECF No. 61-8 at 78, 92. By the Plan's terms, the release was to take effect on the date of the Settlement Parties' final payment. *Id.* at 93–94. In the interim, a channeling injunction stayed all channeled personal injury claims. *Id.* at 114.

The Settlement Parties failed to make an installment payment due on February 17, 2026. ECF No. 61-9 at 2. The nonpayment triggered the Plan's default provision, which dictated that in the event of uncured default, "all Plan injunctions, stays, or releases provided for in favor of the Released Parties that are in effect under the Plan shall be deemed terminated and void." ECF No. 61-8 at 91. The Plan further specified that "the Channeling Injunction w[ould] be terminated." *Id.* On March 4, 2026, the trusts filed notice of the uncured default, instructing the holders of channeled claims that all injunctions and stays were terminated and that claimholders had ninety days to file claims against Tehum and its affiliates. ECF No. 61-9 at 2–3.

[1] The Court hereinafter refers to Perigrove 1018, Perigrove, Lefkowitz, M2 HoldCo, M2 LoanCo, and Geneva as the "Corporate Defendants."

Plaintiff heeded this instruction, filing his First Amended Complaint on June 3, 2026. ECF No. 34. The complaint includes claims that Defendants Adams and Farmer violated Plaintiff's Eighth Amendment right to medical care (Count I) and engaged in medical malpractice (Count III).[2] In addition, the complaint contains an alter ego/veil piercing claim against Defendants Perigrove 1018, Perigrove, and Lefkowitz (Count IV). Finally, the complaint alleges that Defendants Geneva, M2 LoanCo, and M2 HoldCo participated in fraudulent transfers (Count V).

On August 18, 2026, Defendants Perigrove 1018, Lefkowitz, M2 HoldCo, and M2 LoanCo filed a motion to dismiss, asserting that this Court lacks personal jurisdiction, or, alternatively, that Plaintiff lacks standing and has failed to state a claim. ECF No. 60; *see* Fed. R. Civ. P. 12(b)(1), (b)(2), (b)(6). That same day, Defendants Perigrove and Geneva filed a motion to dismiss and joinder in their codefendants' motion. ECF No. 63. On September 8, 2026, Defendant Adams filed a motion to dismiss, arguing that Counts I and III must be dismissed for insufficient service of process, and that Count I fails to state a claim of deliberate indifference. ECF No. 81.

## II. Legal Standards

### A. Personal Jurisdiction

"Personal jurisdiction over a defendant represents the power of a court to enter 'a valid judgment imposing a personal obligation or duty in favor of the plaintiff.'" *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co.*, 646 F.3d 589, 592 (8th Cir. 2011) (quoting *Kulko v. Superior Ct. of Cal.*, 436 U.S. 84, 91 (1978)). The plaintiff bears the burden of establishing a

[2] The complaint also includes claims against Defendants CHS TX, Inc. and YesCare Corp. (Counts II and III), which are stayed pending resolutions of the companies' bankruptcy petitions. ECF No. 31.

prima facie showing of personal jurisdiction, and the Court views the facts in the light most favorable to the plaintiff. *Hawkeye Gold, LLC v. China Nat'l Materials Indus. Imp. & Exp. Corp.*, 89 F.4th 1023, 1030 (8th Cir. 2023). "The evidentiary showing required at the prima facie stage is minimal." *Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 951 (8th Cir. 2022) (quoting *Willnerd v. First Nat'l Neb., Inc.*, 558 F.3d 770, 778 (8th Cir. 2009)). Plaintiff must plead sufficient facts to support a reasonable inference that the defendants can be subjected to jurisdiction within the state. *Id.* The Court may also review affidavits and other exhibits to determine whether personal jurisdiction exists. *Pederson v. Frost*, 951 F.3d 977, 979 (8th Cir. 2020).

"Personal jurisdiction can be specific or general." *Viasystems*, 646 F.3d at 593. "Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state." *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 475 (8th Cir. 2012) (quoting *Miller v. Nippon Carbon Co.*, 528 F.3d 1087, 1091 (8th Cir. 2008)). In a diversity action, a federal court can exercise specific personal jurisdiction "only if authorized by the forum state's long-arm statute and permitted by the Due Process Clause of the Fourteenth Amendment." *Id.* (quoting *Viasystems*, 646 F.3d at 593).

"Missouri's long-arm statute authorizes personal jurisdiction over defendants who engage in certain acts, including '[t]he transaction of any business' within the state and '[t]he commission of a tortious act' within the state." *Zazzle*, 42 F.4th at 951 (alterations in original) (quoting Mo. Rev. Stat. § 506.600). "Extraterritorial acts that produce consequences in the state, such as fraud, are subsumed under the tortious act section of the long-arm statute." *Bryant v. Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 232 (Mo. 2010) (en banc) (citation modified).

Due process requires that there be sufficient "minimum contacts between a defendant and the forum state" so that "jurisdiction over a defendant with such contacts" does not "offend 'traditional notions of fair play and substantial justice.'" *Downing v. Goldman Phipps, PLLC*, 764 F.3d 906, 912 (8th Cir. 2014) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92 (1980)). "The fundamental inquiry is whether the defendant has 'purposefully availed' itself of the 'benefits and protections' of the forum state to such a degree that it 'should reasonably anticipate being haled into court there." *Viasystems*, 646 F.3d at 594 (first quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985), and then quoting *World-Wide Volkswagen*, 444 U.S. at 297). This requirement "ensures that a defendant will not be haled into a jurisdiction solely as the result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party or a third person." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 821 (8th Cir. 2014).

To determine the sufficiency of a defendant's contacts with the forum state, the Court considers five factors: "(1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 648 (8th Cir. 2003).

**B. Failure to State a Claim**

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint. To survive a motion to dismiss for failure to state a claim, the plaintiff's allegations must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff satisfies the plausibility standard when he

"pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A pleading that contains only labels and conclusions, naked assertions, or a formulaic recitation of the elements of a claim without factual support will not suffice. *Hamilton v. Palm*, 621 F.3d 816, 817–18 (8th Cir. 2010).

When ruling on a motion to dismiss, the Court must liberally construe the complaint in the plaintiff's favor. *Cook v. George's, Inc.*, 952 F.3d 935, 938 (8th Cir. 2020). The Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the nonmoving party. *Torti v. Hoag*, 868 F.3d 666, 671 (8th Cir. 2017).

## III. Discussion

### i. Personal Jurisdiction

Plaintiff argues that Corporate Defendants participated in tortious acts that can serve as the basis for personal jurisdiction. "A party relying on a defendant's commission of a tort within [Missouri] to invoke long arm jurisdiction must make a prima facie showing of the validity of his claim." *State ex rel. William Ranni Assocs., Inc. v. Hartenbach*, 742 S.W.2d 134, 139 (Mo. 1987) (en banc). Relevant to Plaintiff's claim is the Missouri Uniform Fraudulent Transfer Act ("MUFTA"), which provides that a transfer is fraudulent when made "with actual intent to hinder, delay, or defraud any creditor of the debtor." Mo. Rev. Stat. § 428.024.

Plaintiff alleges that in order to evade liability for tort claims like his, Corizon transferred a total of $30,038,155.19 to M2 LoanCo and Geneva, neither of which provided any legitimate services of value in exchange. ECF No. 34 ¶¶ 48–49. Around the same time, Lefkowitz sought to secure a favorable Fairness Opinion from the financial advisory firm that was evaluating whether the divisional merger would be fair to Corizon's unsecured creditors. *Id.* ¶ 45. To that end,

Lefkowitz falsified a bank statement to reflect that a Corizon account contained $22,306,821.78 when in fact it only held $12,583.00. *Id.* ¶¶ 44–45.

Corporate Defendants do not dispute that the transfers occurred. Instead, they allege that the transfers flowed from Corizon's Tennessee-based parent, or, in the alternative, that Plaintiff lacks standing to pursue his fraudulent transfer claim, as it is the property of the bankruptcy estate. Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has made the requisite prima facie showing that Corporate Defendants committed a tortious act that produced consequences in Missouri. Thus, the long-arm statute's requirements are satisfied. *See State ex rel. Key Ins. Co. v. Roldan*, 587 S.W.3d 638, 643 (Mo. 2019) (en banc) ("[A] single tortious act is sufficient to support personal jurisdiction.").

The Court next turns to whether the extraterritorial tortious conduct satisfies due process. *Calder v. Jones*, 465 U.S. 783 (1984) set forth an "effects test," which provides that:

> A defendant's tortious acts can serve as a source of personal jurisdiction only where the plaintiff makes a prima facie showing that the defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—in the forum state.

*Johnson v. Arden*, 614 F.3d 785, 796 (8th Cir. 2010) (citation modified).

Accepting the facts as pleaded, draining Corizon's coffers was intentional, was expressly aimed at a Missouri entity, and caused harm in Missouri. *See Hasty v. Corizon, LLC*, No. 22-cv-04054, at *8 (W.D. Mo. Oct. 29, 2026) (exercising personal jurisdiction over Perigrove 1018, Perigrove, Lefkowitz, and Geneva, who "took control of a Missouri company's bank account, drained it, misrepresented its cash position, and then acted to cut off a pending proceeding" (citation modified)); *cf. CitiMortgage, Inc. v. Chicago Bancorp, Inc.*, No. 12-cv-246, 2013 WL 3338501, at *4 (E.D. Mo. 2013) (exercising personal jurisdiction where fraudulent transfers "led

to consequences within" Missouri, including the perpetration of fraud against a Missouri resident). Therefore, Perigrove 1018, Perigrove, and Lefkowitz can be subject to personal jurisdiction in Missouri for purposefully directing their conduct at Missouri by way of the fraudulent transfers.

The Court also finds that it does not violate due process to exercise personal jurisdiction over M2 LoanCo, M2 HoldCo, and Geneva. Courts have regularly exercised personal jurisdiction over the transferees of allegedly fraudulent transfers. *See, e.g.*, *Nat'l Green Gas, L.L.C. v. Estrategy, Inc.*, 18-cv-00285, 2019 WL 13207472, at *6 (W.D. Mo. June 27, 2019) (exercising specific personal jurisdiction over the transferee of an allegedly fraudulent transfer in part because the transferor's principal place of business was in Missouri); *Dontos v. Vendomation NZ Ltd.*, 582 F. App'x 338, 345 (5th Cir. 2014) (explaining that a transferee who "precipitates and directs an alleged fraudulent transfer at the expense of a known creditor in Texas whose right to payment arises out of contracts that share a strong connection with Texas … is subject to suit in Texas court" (citation modified)); *Gambone v. Lite Rock Drywall*, 288 F. App'x 9, 14 (3d Cir. 2008) (affirming the exercise of personal jurisdiction over a nonresident transferee who "participated in a fraudulent conveyance … for the purpose of preventing" Pennsylvania creditors from collecting on a Pennsylvania judgment); *C.D. Acquisition Holdings, Inc. v. Meinershagen*, No. 05-cv-1719, 2007 WL 184796, at *5–7 (W.D. Penn. Jan. 22, 2007) (exercising personal jurisdiction over the transferees of an allegedly fraudulent transfer that was "designed to insulate" the transferor's assets "from the reach of Pennsylvania creditors holding a Pennsylvania judgment"). As the recipients of allegedly fraudulent transfers, M2 LoanCo, M2 HoldCo, and Geneva are subject to personal jurisdiction.

Corporate Defendants' other contacts with the forum state further assure the Court that its exercise of personal jurisdiction will not offend traditional notions of fair play and substantial justice. By "dominat[ing] and direct[ing] all aspects of Corizon's corporate governance and operations," ECF No. 34 ¶ 12, Lefkowitz, Perigrove 1018, and Perigrove purposely availed themselves of the forum state's benefits and protections. *Epps*, 327 F.3d at 649 (holding that where a nonresident corporate defendant acts as the alter ego of its Missouri subsidiary, "the subsidiary's contacts are those of the parent corporation's and due process is satisfied"); *see also Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc.*, 519 F.2d 634, 637 (8th Cir. 1975) ("[T]he fiction of a corporate entity may be disregarded, where one corporation is so organized and controlled and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of another corporation." (quoting *Fisher v. First Nat'l Bank*, 338 F. Supp. 525, 529 (S.D. Iowa 1972))). They also orchestrated the two-step transaction that merged a Missouri limited liability company out of existence. Even though the transaction was conducted pursuant to Texas law, only a handful of states allow divisional mergers, and it is not surprising that the company would choose to merge in the state with the most advantageous merger laws. *See Nagy v. Riblet Prods. Corp.*, 79 F.3d 572, 576 (7th Cir. 1996) ("States compete to provide better rules of corporate law, from which entrepreneurs may choose.").

In arguing against personal jurisdiction, Lefkowitz relies on *Di Ricco v. Missouri Commissioner of Securities*, 698 S.W.3d 760 (Mo. Ct. App. 2024) and *A.O.A. v. Rennert*, 350 F. Supp. 3d 818 (E.D. Mo. 2018), neither of which persuade the Court. In *Di Ricco*, a Nevada start-up company secured investments from Missouri residents and then defaulted on the notes. 698 S.W.3d at 769–70. Following an administrative action by the Missouri Commissioner of Securities, the company's CEO and CFO each appealed to contest personal jurisdiction. The

Missouri Court of Appeals held that the CEO could be subject to personal jurisdiction because he was "personally involved" in the underlying misconduct. *Id.* at 777. The CFO could not, however, because he did not draft, approve, or execute the notes, nor did he prepare the marketing materials or communicate with investors. *Id.* at 778. The Court finds that Lefkowitz more closely resembles the CEO. By falsifying a Missouri company's bank statement, opening bank accounts to which Corizon's CFO lacked access, orchestrating the divisional merger, and filing a document with the Missouri Secretary of State to update the company's organizational documents in accordance with that merger, he personally involved himself in the fraudulent scheme. *A.O.A.* is also inapposite. There, the Court dismissed the directors of a defendant company who were not "dominant or controlling." 350 F. Supp. 3d at 831. Plaintiff has alleged, by contrast, that Lefkowitz "dominated and directed all aspects of Corizon's corporate governance and operations." ECF No. 34 ¶ 12.

The Court concludes that it has personal jurisdiction over Corporate Defendants.

**ii. Standing**

Corporate Defendants argue that Plaintiff lacks standing to bring Counts IV and V because claims of fraudulent transfer and veil piercing belong to the bankruptcy estate. When a debtor files for bankruptcy, he "creates an estate" that includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The debtor may then form a reorganization plan with its creditors that governs the distribution of the estate's assets and is submitted to the bankruptcy court for approval. *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 214 (2024). Once the bankruptcy court approves the plan, it "binds the debtor and its creditors going forward." *Id.*; *see also JCB, Inc. v. Union Planters Bank, NA*, 539 F.3d 862,

870 (8th Cir. 2008) ("Once confirmed, a Chapter 11 plan acts as both a contract which binds the parties and as an order of the bankruptcy court.").

Because a confirmed Chapter 11 plan operates as a contract, general rules of contract interpretation apply. *Bailey v. Monsanto Co.*, 176 F. Supp. 3d 853, 866 (E.D. Mo. 2016). "The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Jacobson Warehouse Co., Inc. v. Schnuck Mkts., Inc.*, 13 F.4th 659, 668 (8th Cir. 2021) (quoting *J.H. Berra Constr. Co. v. City of Washington*, 510 S.W.3d 871, 874 (Mo. Ct. App. 2017)). When interpreting a contract, the Court considers the document as a whole, giving words their ordinary meaning and avoiding an interpretation that would render other provisions meaningless. *See Schnuck Mkts., Inc. v. First Data Merch. Servs. Corp.*, 852 F.3d 732, 738 (8th Cir. 2017); *Jacobson*, 13 F.4th at 670.

Turning first to fraudulent transfer, the Eighth Circuit has held that claims to recover fraudulent transfers are the property of the bankruptcy estate. *In re Simply Essentials, LLC*, 78 F.4th 1006, 1008–09 (8th Cir. 2023). Accordingly, individual creditors like Plaintiff would ordinarily lack standing to pursue such claims. *See id.*; *see also In re Racing Servs., Inc.*, 540 F.3d 892, 900 (8th Cir. 2008) (holding that a creditor may obtain derivative standing to bring a fraudulent transfer claim only upon showing that the trustee was unable or unwilling to pursue the claim). However, when Corporate Defendants failed to cure their installment payment default, the channeling injunction terminated and the Trusts' beneficiaries, including Plaintiff, had "ninety (90) days from the date of termination to commence Causes of Action against the Released Parties." ECF No. 61-8 at 114. The Plan defines "Causes of Action" broadly to include "any claims" or "causes of action" and specifically enumerates avoidance actions and claims that can be asserted either "directly or derivatively." *Id.* at 65. By its plain language, therefore, the

Plan allows Plaintiff to bring Count V. *See Hasty*, No. 22-cv-04054, at *12; *see also Bouton v. Missouri*, 22-cv-00010, 2026 WL 1551737, at *5 (E.D. Mo. June 2, 2026) (granting plaintiffs leave to amend their complaint to add a claim of fraudulent transfer against the Corizon affiliates).

Proceeding to veil piercing, Corporate Defendants maintain that claims based on the doctrines of alter ego and veil piercing were initially the property of the estate and now belong to the Trusts. It is true that the Plan's definition of "Estate Causes of Action" includes claims based on the doctrines of alter ego and veil piercing. ECF No. 61-8 at 69. Importantly, however, the Debtor must have been able to assert those claims on its own behalf for them to have been included in the Estate property that was conveyed to the Trusts. *See id.* As Plaintiff seeks to recover from Perigrove 1018, Perigrove, and Lefkowitz based on an underlying injury that is inherently personal to him, Debtor could not have brought his claim, and it does not belong to the Trusts.

That the bankruptcy trustees are also pursuing claims of fraudulent transfer and veil piercing does not foreclose Plaintiff's claims as a matter of law. *See In re Popkin & Stern*, 287 B.R. 738, 743 (B.A.P. 8th Cir. 2003) (allowing both the bankruptcy trustee and an individual creditor to proceed against the debtor following a Chapter 11 default). The Court finds that Plaintiff has standing to bring Counts IV and V.

**iii. Failure to State a Claim**

Corporate Defendants also assert that Counts IV and V should be dismissed for failure to state a claim.

To state a claim for veil piercing under Missouri law, a plaintiff must plead three elements. First, there must be control that amounts to the complete domination of finances,

policies, and business practices, such that the corporate entity has "no separate mind, will or existence of its own." *Doe 1631 v. Quest Diagnostics, Inc.*, 395 S.W.3d 8, 18 (Mo. 2013) (en banc). Second, that control must be used to perpetrate fraud or other wrong, to violate a statutory or other positive legal duty, or to contravene the plaintiff's rights via a dishonest and unjust act. *Id.* Third, the control and breach of duty must cause the plaintiff's injury. *Id.* "A court may pierce the corporate veil or disregard the separate corporate entity if the separateness is used as a device to defraud a creditor." *Taylor v. Clark*, 140 S.W.3d 242, 254 (Mo. Ct. App. 2004).

Plaintiff alleges that Perigrove 1018 was Corizon's beneficial owner and parent, that Lefkowitz controlled Perigrove 1018 and used it to "dominate[] and direct[] all aspects of Corizon's corporate governance and operations," and that Lefkowitz "operated Corizon as a mere instrumentality." ECF No. 34 ¶¶ 12, 40. Plaintiff pleads that Perigrove 1018 and Lefkowitz orchestrated interested transactions, "commingled assets including bank accounts, failed to maintain adequate business records, failed to maintain adequate business records, and utilized corporate funds for personal purposes." *Id.* ¶ 40. Plaintiff also describes how Lefkowitz opened bank accounts in Corizon's name to which only Perigrove 1018's members had access and orchestrated fraudulent transfers that left Corizon undercapitalized. *Id.* ¶ 43, 77. Plaintiff further alleges that Lefkowitz controlled Perigrove, which was Perigrove 1018's alter ego. *Id.* ¶ 13. The Court finds that these allegations sufficiently plead the complete domination of Corizon.

Plaintiff then alleges that Perigrove 1018, Perigrove, and Lefkowitz used their control of Corizon to defraud creditors. The Court finds *66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32 (Mo. 1999) (en banc) to be instructive. There the court pierced the veil when an undercapitalized shell corporation was used to avoid a company's debts arising from a legal proceeding. *Id.* at 41. According to Plaintiff, Lefkowitz has similarly drained Corizon of

assets that tort creditors like Plaintiff would have been entitled to recover, circumventing Corizon's duties by way of the divisional merger and the fraudulent transfers to M2 LoanCo and Geneva. Therefore, the Court finds that Plaintiff has adequately pleaded the second element of veil piercing.

Finally, Plaintiff has established causation. Corporate Defendants contend that this element is not satisfied because Plaintiff's injury occurred before the alleged fraudulent scheme commenced. However, Plaintiff's claim as to Count IV concerns the stripping of Corizon's assets, not his underlying negligence claim. As Plaintiff explains, his injury is the "unjust loss of [his] ability to recover on a claim Corizon was obligated to pay." ECF No. 93 at 17. The Court therefore concludes that Plaintiff states a claim of veil piercing under Missouri law.

Corporate Defendants also maintain that Count V fails to state a claim against M2 HoldCo, arguing that Plaintiff's bare assertion that M2 HoldCo is M2 LoanCo's parent company fails to establish liability. Plaintiff alleges that, as M2 LoanCo's "parent and controlling entity," M2 HoldCo "received the benefit of the fraudulent transfers made to M2 LoanCo and is jointly and severally liable therefor." ECF No. 34 ¶ 85.

Under MUFTA, the creditor who prevails on a fraudulent transfer claim may recover from the initial transferee, any subsequent transferee who does not take in good faith, or "the person for whose benefit the transfer was made." Mo. Rev. Stat. § 428.044.2. When determining whether a defendant is the "entity for whose benefit" the fraudulent transfer was made, courts are to "look through the form of the transaction and determine which entity actually benefitted from the transfer." *In re Meredith*, 527 F.3d 372, 376 (4th Cir. 2008) (quoting *In re Compton Corp.*, 831 F.2d 586, 595 (5th Cir. 1987)); *see also Boyer v. Belavilas*, 474 F.3d 375, 377–78 (7th Cir. 2007) (holding that an individual who could treat the transferred funds as her own was the entity

for whose benefit the transfer was made). The Court does so here, where M2 LoanCo is alleged to be the wholly owned subsidiary of M2 HoldCo and to have no employees of its own. By asserting that M2 LoanCo is, in effect, a shell company that Lefkowitz controls via M2 HoldCo, Plaintiff has stated a claim that M2 HoldCo is an entity for whose benefit the fraudulent transfers were made.

Corporate Defendants note that under Missouri law, members of a limited liability company are not liable for the company's debts, obligations, or liabilities "solely by reason of being a member." Mo. Rev. Stat. § 347.057. They cite *May v. Williams*, 531 S.W.3d 576 (Mo. Ct. App. 2017), where the Missouri Court of Appeals applied this principle to a fraudulent transfer. In *May*, a creditor sought to recover from an LLC and its individual members. *Id.* at 584. Because the plaintiff did not seek to pierce the corporate veil, the court held that the LLC's members were not liable for its fraudulent transfers. *Id.* at 585. Plaintiff, by contrast, does not base M2 HoldCo's liability solely on its membership in M2 LoanCo. As discussed above, Plaintiff also asserts that by virtue of its status as the sole member of M2 LoanCo, M2 HoldCo received the benefit of the fraudulent transfers to M2 LoanCo. Thus, Plaintiff states a claim of fraudulent transfer against M2 HoldCo.

**B. Individual Defendants**

**i. Service of Process**

Plaintiff filed his original complaint on December 20, 2022, asserting claims of medical malpractice and deliberate indifference against Defendant Adams. ECF No. 1 ¶¶ 34–53. After the Settlement Parties defaulted on the bankruptcy Plan and the channeling injunction terminated, Plaintiff filed his First Amended Complaint on June 3, 2026, reasserting the same claims against Defendant Farmer and adding claims against additional Corporate Defendants. ECF No. 34 ¶¶

54–59, 69–86. Two days later, the Court ordered Plaintiff to effectuate service on the new Corporate Defendants and Defendants Adams and Farmer in accordance with Federal Rule of Civil Procedure 4. ECF No. 37. Plaintiff promptly complied, serving Defendant Adams on July 11, 2026. ECF No. 52.

Defendant Adams argues that Count III must be dismissed with prejudice because Plaintiff failed to comply with the service requirement set forth in Mo. Rev. Stat. § 516.105. Alternatively, Defendant Adams contends that Counts I and III should be dismissed for insufficient service of process under Federal Rules of Civil Procedure 12(b)(5) and 4(m). Plaintiff responds that Missouri's statute directly conflicts with Rule 4(m), which he complied with by serving Defendant Adams when he did.

If a state statute directly conflicts with a federal procedural rule, the federal rule governs "unless it 'exceeds statutory authorization or Congress's rulemaking power.'" *Berk v. Choy*, 607 U.S. 187, 192 (2026) (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010)). Courts have applied Federal Rule of Civil Procedure 4 to the exclusion of state laws on several occasions. *See Hanna v. Plumer*, 380 U.S. 460, 463–64 (1965) (applying Rule 4 rather than state law regarding service of process); *Cooper v. Ark. Dep't of Corr.*, 17-cv-337, 2018 WL 736322, at *2 (E.D. Ark. Jan. 19, 2018) ("Even though the Federal Rules allow for service to be made in a manner provided under state law, the Federal Rules dictate the time by which service must be completed."); *cf. G.G.G. Pizza, Inc. v. Domino's Pizza, Inc.*, 67 F. Supp. 2d 99, 101–02 (E.D.N.Y. 1999) (applying Rule 4(m) instead of a state law governing service once the case was removed to federal court).

Turning to the statute in question, under Mo. Rev. Stat. § 516.105, a plaintiff serving a defendant after the two-year statute of limitations has expired must effectuate service "within one hundred eighty days of the filing of the petition." *Id.* If the plaintiff fails to do so, "the court shall dismiss the action against the defendant." *Id.* By contrast, Rule 4(m) reads, in relevant part:

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).

The Court finds that the rules are in direct conflict. Rule 4(m) "convey[s] a clear message: Complaints are not to be dismissed if served within [90] days, or within such additional time as the court may allow." *Henderson v. United States*, 517 U.S. 654, 663 (1996). Under Missouri law, however, a plaintiff's malpractice case against a defendant served outside of the 180-day window must be dismissed. As applied to Plaintiff's case, the Missouri rule mandates dismissal, and the Federal Rule does not. They are therefore in conflict, and Rule 4(m) governs.

Defendant Adams relies on *Walker v. Armco Steel Corp.*, 446 U.S. 740 (1980) and *Ragan v. Merchants Transfer & Warehouse Co.*, 337 U.S. 530 (1949) for the proposition that Mo. Rev. Stat. § 516.105 is substantive and should govern under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). The Court is not persuaded. In *Walker* and *Ragan*, there was no conflict between Fed. R. Civ. P. 3 and the state laws in question, thus *Erie* applied. *Walker*, 446 U.S. at 752–53. But "when a Federal Rule of Civil Procedure is on point, a federal court bypasses *Erie*'s inquiry altogether." *Berk*, 607 U.S. at 192. "[A] valid Rule of Civil Procedure displaces contrary state law even if the state law would

qualify as substantive under *Erie*'s test." *Id.* For the reasons discussed above, Fed. R. Civ. P. 4(m) is on point and displaces Mo. Rev. Stat. § 516.105. Accordingly, even if Missouri's statute is substantive, Rule 4 governs.

Under Rule 4, the Court ordered that Plaintiff serve Defendant Adams within a specified time, and Plaintiff promptly complied. ECF Nos. 37, 52. Implicit in the Court's order was a finding that good cause justified Plaintiff's initial delay in service, and Defendant Adams' motion to dismiss for improper service will be denied.

**ii. Deprivation of Medical Care (Count I)**

Defendant Adams also argues that Count I should be dismissed for failure to state a claim of deliberate indifference. The Eighth Amendment's prohibition on cruel and unusual punishment protects prisoners from deliberate indifference to serious medical needs. *Smith-Dandrige v. Geanolous*, 97 F.4th 569, 575 (8th Cir. 2024). Deliberate indifference has both an objective and a subjective component. *Id.* The objective component requires the plaintiff to demonstrate an objectively serious medical need, and the subjective component requires the plaintiff to show that the defendant knew of and disregarded such need. *Id.*

Plaintiff sufficiently pleaded that he exhibited an objectively serious medical need that was "so obvious that even a layperson would have easily recognized the necessity for a doctor's attention." *Mitchell v. Saint Louis Cnty.*, 160 F.4th 950, 957 (8th Cir. 2025). As in *Mitchell*, where the inmate was experiencing "classic" stroke symptoms, including slurred speech and an inability to walk or eat, *id.* at 957–58, Plaintiff exhibited difficulty speaking, weakness in his right side, and confusion, including the inability to state when he was born or where he lived. ECF No. 34 ¶ 34. Plaintiff's symptoms progressed, and he had difficulty swallowing, pain in his right leg and arm, and was unable to follow commands during hand grip checks. *Id.* ¶ 35. Even if

Defendant Adams did not know that Plaintiff's symptoms were indicative of a stroke, he "showed obvious signs of an objectively serious medical need." *Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016) ("We determine whether an objectively serious medical need exists based on the attendant circumstances, irrespective of what the [defendant] believes the cause to be."). Therefore, the amended complaint has stated sufficient facts to show that Plaintiff was experiencing a medical need so obvious that even a layperson would have recognized the need for emergency medical intervention. *See id.*

Plaintiff plausibly pleaded that Defendant Adams knew of and deliberately disregarded his serious medical need. The complaint alleges that on December 29, a nurse informed Defendant Adams of Plaintiff's symptoms, including his inability to state when he was born or where he lived. ECF No. 34 ¶ 33. After learning of Plaintiff's condition, Defendant Adams did not visit him in administrative segregation or provide him with any treatment. *Id.* The following day, a psychiatrist reiterated that Plaintiff was having difficulty speaking, was confused, and was experiencing weakness on his right side. *Id.* ¶ 34. Defendant Adams personally observed Plaintiff's symptoms but did not arrange for emergency medical treatment until December 31, 2020. *Id.* ¶¶ 35–36. Such delays in treating Plaintiff's stroke may constitute deliberate indifference. *See Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019) ("A delay in treating a serious medical need can constitute deliberate indifference."); *see also Plemmons v. Roberts*, 439 F.3d 818, 824–25 (8th Cir. 2006) (denying summary judgment to prison officials who delayed treatment for an inmate experiencing "classic heart attack symptoms"). Defendant Adams counters that her course of treatment was, at most, negligence or medical malpractice, but her failure to provide any treatment on December 29 and her delay in sending Plaintiff to the hospital

were more than mere negligence. *See Mitchell*, 160 F.4th at 959. Accordingly, Defendant Adams's motion to dismiss for failure to state a claim will be denied.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motions to Dismiss (ECF Nos. 60, 63, and 81) are **DENIED**.

**IT IS FURTHER ORDERED** that Defendants shall file their answers to Plaintiff's amended complaint (ECF No. 34) within **fifteen (15) days** of this Order.

Dated this 19th day of November, 2026

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE